**SOUTHERN RAILWAY COMPANY**

v.

**The UNITED STATES.**

**ALABAMA GREAT SOUTHERN RAILROAD COMPANY**

v.

**The UNITED STATES.**

Nos. 19–72, 69–75.

United States Court of Claims.

Oct. 18, 1978.

As Amended Dec. 15, 1978.

Daniel M. Gribbon, Washington, D. C., Atty. of record for plaintiffs; Harris Weinstein, Coleman S. Hicks, and Wayne S. Kaplan, Covington & Burling, William C. Antoine, Southern Railway System, Washington, D. C., of counsel.

Daniel F. Ross, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Theodore D. Peyser, and Donald H. Olson, Washington, D. C., for defendant.

Before COWEN, Senior Judge, DAVIS and BENNETT, Judges.

## ON PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

COWEN, Senior Judge:

A single legal issue is here raised in two separate actions for the refund of income taxes which were argued together, and which we now consolidate for disposition. The litigation [1] arises out of plaintiffs' use of the retirement method of accounting for depreciation.[2] Neither of the plaintiffs has detailed records showing the historical costs of their roadway assets between the dates the companies were organized and the dates of valuation of their assets by the Interstate Commerce Commission (ICC) pursuant to the Railroad Valuation Act of March 1, 1913, 37 Stat. 701. The question for decision is whether plaintiffs are entitled, as a matter of law, to include in the bases of their roadway assets and to deduct upon the retirement of those assets, portions of the ICC estimates of taxes and interest which the taxpayers incurred during construction. For the reasons to be set forth below, we hold that since the ICC estimates contain the best information available, plaintiffs are entitled to include such estimates in the bases of their roadway assets, and we grant plaintiffs' motions for partial summary judgment to that extent.

We further conclude however, that in the determination of the amount to be recovered, the ICC estimates of interest and taxes shall be reduced by the amount of interest and taxes which plaintiffs deducted in their Federal tax returns in the years from 1909 through 1916. For Southern Railway Company, the ICC valuation date was June 30, 1916, and for Alabama Great Southern Railroad Company, the date was June 30, 1918.

### I. Background

Plaintiffs' claims for the tax years 1947–53 are based upon sections 23(1), 23(n), 113(a), 113(b)(1)(A) through (C) and 114(a) of the 1939 Internal Revenue Code. Their claims for the tax years 1954–56 are based upon sections 1011, 1012, 1016(a)(1) through (3) and 1053 of the 1954 Internal Revenue Code. The defendant agrees that under the retirement method of accounting used by the taxpayers, they are entitled under the cited Code provisions to deduct the adjusted bases (or capitalized costs) of their roadway assets in the year the assets were retired. However, the Internal Revenue Code does not settle the question as to whether plaintiffs may utilize the ICC estimates in making adjustments to their bases, and it is defendant's position that plaintiffs may not use such estimates of taxes and interest for any purpose or to any extent in the computation of their income taxes for the years in suit.

Plaintiff, Southern Railway Company (Southern) was organized in 1894; plaintiff, Alabama Great Southern Railroad Company (Alabama) was organized in 1877. From the time of their respective organizations until the dates of the ICC valuations, plaintiffs, through no fault of their own, did not maintain the kind of cost and accounting records required by modern-day tax and other Federal regulatory procedures. *See Boston & Maine RR v. Commissioner of Internal Revenue*, 206 F.2d 617, 626, n. 8 (1st Cir. 1953).

---

1. Plaintiffs advise us in their briefs that all issues raised in their complaints, other than the one discussed in this opinion, are the subject either of a pending offer in compromise or have been withdrawn.

2. We shall not embark upon an elaborate explanation of the retirement method of accounting. Previous cases have met that task admirably. *See Missouri Pacific RR Co. v. United States*, 497 F.2d 1386, 1396, 204 Ct.Cl. 837, 854 (1974); *Chicago, Burlington & Quincy RR v. United States*, 455 F.2d 993, 1005, 197 Ct.Cl. 264, 284–85 (1972), *rev'd on other grounds*, 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973); *Boston & Maine RR v. Commissioner of Internal Revenue*, 206 F.2d 617, 619 and n. 1 (1st Cir. 1953).

Cognizant of the fact that over the years our nation's railroad companies had constructed their main lines without accounting sufficiently for costs, Congress enacted the Railroad Valuation Act of March 1, 1913, ch. 92, 37 Stat. 701, requiring the ICC to "make an inventory which shall list the property of every common carrier * * * in detail, and show the value thereof * *." The ICC responded to this congressional mandate energetically and thoroughly. For each railroad, the Commission valued the "cost of reproduction new" of each of its assets as of a specific valuation date. The valuations were made within three major component categories: (1) costs of roadway construction and maintenance, such as engineering, grading, bridges, ties, rails, and the like; (2) costs of equipment, such as railway cars; and (3) general expenditures, which included overhead costs such as organization expenses, general officers' and clerks' salaries, legal expenses, stationery and printing, and other general expenditures including the two costs in issue here—taxes and interest during construction. The Commission reached its determinations with respect to each component of the cost of reproduction new only after completing a detailed inventory "of each piece of property of the carrier" and after analyzing "a great number of pieces of construction which had been completed within the [previous] 10 or 15 years * * *." *Texas Midland Railroad*, 75 I.C.C. 1, 113, 150

(1918). Overall, the ICC mastered a laborious task and competently produced many volumes of sorely needed cost estimates.

The Government has conceded that the ICC estimates of plaintiffs' so-called Federal inventory property are "the best evidence" of the taxpayers' bases in the property for which plaintiffs have no sufficient cost records. Moreover, in determining bases; including overheads incurred during construction prior to the ICC valuation dates, the Internal Revenue Service accepts the ICC estimates except as they pertain to adjustments for taxes and interest during construction.[3] To the extent that the IRS accepted the ICC valuations in determining bases, the First Circuit has approved the Commissioner's judgment. *Boston & Maine, supra*, at 624.

With respect to one component of overhead involved in constructing a railroad, the cost of engineering, the Commissioner originally refused to accept the ICC estimate. The Tax Court, however, reversed the ruling of the Commissioner. *Boston & Maine RR v. Commissioner*, 16 T.C. 1517, 1531 (1951), *vacated and remanded on other grounds*, 206 F.2d 617 (1st Cir. 1953). The Commissioner did not appeal that judgment, and at oral argument on the motions before us in these cases, counsel for the Government advised us that the Commissioner now acquiesces in acceptance of the ICC valuation for engineering costs.[4]

3. The Internal Revenue Manual provides:
"320
*"Federal Inventory Value*
* * * * * *
"(2) * * * Basically, because of the inadequate property records maintained by railroads, which the Congress attempted to correct by the Valuation Act of 1913, the Internal Revenue Service has generally accepted the Engineering Report Cost of Reproduction, New, as the tax basis with subsequent additions and retirements carried forward. * * *
* * * * * *
"423
*Depreciation of Road Property*
"(2) * * * Though this basis [I.C.C. valuation] is not a statutory basis, the Internal Revenue Service generally accepts this basis as the tax basis. * * * General overheads, described at 614 below, to the extent

reasonably ascertainable are also included as part of the property that is being depreciated. However, Taxes and Interest During Construction, Accounts 75 and 76, were never allowable as part of the basis. * * *" I C.C.H. Internal Revenue Manual, Part IV—Audit, No. 320 at 7265–17, No. 423 at 7265–34.

4. The Government contends in its brief that the Tax Court holding in *Boston & Maine* with respect to the Commissioner's disallowance of a deduction for engineering costs is factually distinguishable from the Government's contentions here with respect to the Commissioner's disallowance of plaintiffs' deductions for taxes and interest during construction. Defendant's Brief at 26–27. In the Tax Court decision in *Boston & Maine*, the Commissioner argued that the cost of engineering was not deductible, because it was not retired and thus its value was

## II.  The *Boston & Maine* Case

■ The First Circuit's decision in *Boston & Maine, supra,* is solid authority for our conclusion that plaintiffs are entitled to include the ICC estimates of taxes and interest in computing their deductible tax bases resulting from the retirement of their Federal inventory properties.  In that case, the Commissioner agreed that plaintiff's tax basis in certain items of retired Federal inventory property should be estimated by reference to the ICC-determined cost of reproduction new of the property.  The Commissioner ruled, however, that plaintiff's basis should be reduced by the Commissioner's estimate of depreciation sustained prior to March 1, 1913.  The Tax Court rejected the Commissioner's interpretation of the Internal Revenue Code but sustained the result he reached on the ground that since plaintiff was unable to prove that its actual tax basis in its retired property exceeded the amount allowed by the Commissioner, plaintiff must therefore accept the Commissioner's estimate of its basis.

### A.  The "Best Estimate" Rule.

In *Boston & Maine,* which reversed the decision of the Tax Court, the First Circuit interpreted *Cohan v. Commissioner of Internal Revenue,* 39 F.2d 540 (2d Cir. 1930) as establishing

> * * * the general principle that where some deduction is clearly warranted but its amount cannot be properly ascertained, the Commissioner shall make the best estimate he can.

*Boston & Maine, supra,* at 624, n. 6.

Manifestly, the estimates made by the ICC provide the best, and in fact the only, available source for determining the tax bases of the taxpayers' properties.  Accordingly, we hold that the *Cohan* rule should be applied in these cases with respect to the ICC estimates of taxes and interest during construction.

The Government, however, argues that the *Cohan* rule may not be applied here because the plaintiffs have not shown that they actually incurred expenditures for taxes and interest during construction.  Defendant, therefore, contends that these cases should be decided under the rule enunciated by *Burnet v. Houston,* 283 U.S. 223, 228, 51 S.Ct. 413, 415, 75 L.Ed. 991 (1931).

> * * * the impossibility of proving a material fact upon which the right to relief depends simply leaves the claimant upon whom the burden rests with an unenforcible [sic] claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof. * * *

That case involved a plaintiff who did not even attempt "to produce the best available evidence of value which the circumstances and nature of the transaction permitted" for determination of his basis in 1913 of stocks and other property on which he claimed deductions for losses sustained in 1920.  *Id.* at 228–29, 51 S.Ct. at 415.

■ The situation here is exactly opposite to that in *Burnet.*  Plaintiffs have met their burden of proof by showing that they did actually incur expenditures for taxes and interest during construction, and have provided the best estimates which are now available for the amount of such interest and taxes.  Attached to their motions are affidavits showing that interest-bearing bonds were issued for the construction and improvement of their roadways in the years prior to the ICC valuation.

In *Texas Midland, supra,* at 155, the Commission explained that interest during construction *"is universally conceded* [to be] * * * `an item of expense in the con-

---

not lost, when the railroad retired the property to which it had been allocated.  The Tax Court found that the value of the engineering indeed had been lost to the railroad and thus rejected the Commissioner's argument.  16 T.C. at 1531.  Although the Government correctly contends that the Tax Court never specifically held *per se* that ICC estimates of engineering costs are

always acceptable estimates for determining engineering costs allocable to the adjusted basis of railroad property constructed prior to the ICC valuation date, it is nonetheless true that the Commissioner never appealed the Tax Court decision in *Boston & Maine* with respect to the engineering issue and now acquiesces in the deduction of such costs.

struction of the property which should be included in a reproduction estimate." (Emphasis added.)

■ With respect to interest during construction, the Government argues that the ICC figures include an amount for nondeductible imputed interest on plaintiffs' own funds which were used in construction. This claim is not substantiated in the Government brief, but at oral argument, Government counsel stated that in *Texas Midland, supra*, it is shown that the ICC calculated its estimates of interest during construction on "borrowed capital and equity capital." However, our review of the ICC decision does not uncover any clear statement that the estimates included any imputed interest. There is an isolated statement that "ordinarily a railroad corporation finally obtains the money with which to defray the expense of constructing its property by the sale of stocks and bonds, but the date at which such sale is effected depends upon a variety of circumstances." *Id.* at 153. Aside from this general statement, all other explanation of the "cost of obtaining money" in *Texas Midland* centers on the cost of issuing bonds and the rate of interest which would be needed to cover the entire cost of obtaining money. *Id.* at 153–54. Moreover, the ICC assumed in determining the length of time for which interest should be reckoned, that the carrier would have some funds on hand at the time construction was started. With this in mind, the ICC computed interest for one-half of the assumed construction period of 6 months, plus 3 months. *Id.* at 157. We conclude, therefore, that the Government has not demonstrated that there is any reason to believe that the ICC estimate includes a significant amount of imputed interest, if any, or that its estimate of interest during construction is any more inexact than 44 other estimated components of construction costs which have been accepted by the Commissioner.

The Commission also reported that its estimate of taxes paid was computed on the basis of "individual cases which were believed to be fairly typical of what might be expected under normal conditions * *." *Id.* at 152.

We do not doubt that plaintiffs paid *ad valorem* taxes to the political subdivisions in which their properties were located. But the Government makes the unsupported suggestion that plaintiffs may never have paid any taxes during construction, because in the late 19th and early 20th Centuries, some states exempted railroads from taxation. The ICC answered this contention in its explanation of its methodology for computing "general expenditures" as follows:

* * * In states where no taxes are levied upon railroad property during construction, *that fact is considered. Id.* at 153 (Emphasis added).

Finally, the Government itself tacitly acknowledges that plaintiffs paid taxes during construction by declaring that plaintiffs' tax returns show that they took deductions for taxes and interest in the years from 1909 through 1916 in computing net income which was subject to taxation during those years. [Defendant's Brief at p. 24.] We deal with this contention in part III of this opinion.

We find, therefore, that plaintiffs have met the requirements of the *Cohan* rule as interpreted and approved in *Boston & Maine.*

### B. The Arbitrary and Erroneous Action of the IRS.

■ In *Boston & Maine, supra,* the First Circuit found that the Commissioner acted arbitrarily and erroneously in using the ICC estimates of plaintiff's Federal inventory property as a starting point and then reducing these valuations by the Commissioner's estimate of depreciation sustained prior to 1913. After finding that it was agreed by all parties that the actual cost of the property was unknown and unknowable, the court declared there was

* * * no sound reason why the Commissioner's erroneous subtraction of pre-1913 depreciation should nevertheless be sustained solely on the ground that the taxpayer for lack of the necessary cost records cannot show the inaccuracy of the

end result. Surely the requirement imposing the initial burden of proof on the taxpayer cannot go this far. *The mere fact that the taxpayer is unable to prove the exact figures of original cost should not entitle the Commissioner, under the shelter of the rule as to the burden of proof, to use any and all means, no matter how obviously illogical and incorrect, to arrive at a substitute figure.* Such a rule would in a situation like this leave the taxpayer wholly at the whim and caprice of the government.

*Id.* at 626 (emphasis added). In the case at bar we find that it was also "obviously illogical and incorrect" for the Commissioner to accept the ICC estimates for 44 out of 46 component costs of constructing plaintiffs' railroads while refusing to accept the estimates for taxes and interest, even as a starting point. There is no rational explanation for the Government's position; its unreasonableness is demonstrated acutely by the fact that the IRS has accepted other overhead items, including engineering, organization expenses, general officers' and clerks' salaries, legal expenses, and the cost of stationery.

Perhaps a major fallacy in the Government's refusal to allow the use of the estimates for taxes and interest for any purpose rests on its mistaken notion that the accepted items are "known expenditures," the cost of which was "reasonably ascertainable." [Defendant's Brief at pp. 33–34.] This position is patently incorrect, as shown by the ICC explanation of its methodology for all of its valuations. *See Texas Midland, supra,* at 108–82.

In *Texas Midland,* at p. 16, the ICC stated:

If original conditions were to govern, data concerning the work done many years ago could not be obtained in many instances. * * *

* * * * * *

*Cost of reproduction new is at best an estimate * * *.*

* * * * * *

(Emphasis added.)

In *Texas Midland,* at p. 11, the ICC also stated:

* * * The engineer making the estimate assumed that the road was not in existence. * * * The items which make up the physical property were * * inventoried and cost prices fairly representative of conditions on valuation date were applied. To the figures thus obtained was added the estimated cost of placing the items in position as of valuation date, including certain overhead charges. The result thus arrived at is the cost of reproduction new.

The estimate of overheads accepted by the Commissioner, plus estimates of taxes and interest during construction, were included in a general category classified as "general expenditures." The experience of the past with regard to these costs varied from geographical region to geographical region and construction project to construction project. In *Texas Midland,* at p. 30, the ICC explained:

The percentage [of general expenditure out of total construction cost, exclusive of general expenditure and land] for the western district is too low and is accounted for by the fact that many of the properties considered were constructed by parent companies. A considerable part of the office work was actually done by the parent organizations, and the expenses incident thereto were not included in the accounts of the carrier under construction. On the other hand, the percentage for the Pacific district is abnormally high, due to the fact that the construction period of the Western Pacific, one of the roads included in the study, was extremely long, about seven years. * * * It was thought desirable, therefore, to make an examination of individual properties where the circumstances of construction were fully known. The carriers referred to the Virginian Railroad as being such a property, and the bureau agrees that it is illustrative, because it is a high-grade road and ample time was taken to construct and equip it before operations began. The percentage in this case was

found to be 1.889. The Winston-Salem Southbound is another property as to which we have satisfactory information, and the percentage shown for it was 1.271. * * *

After careful deliberation, the bureau concluded that 1½ percent of the amount of all road accounts, exclusive of land, *would be a fair estimate for general expenditures in the case of all roads.* * *

(Emphasis added.) Without question, the ICC's explanations of its methodology is clear evidence that its estimates of all overhead costs, including the cost of taxes and interest, are not reflections of actual cost. We perceive no reason for sustaining the Commissioner's demand for a more accurate showing of the actual costs of taxes and interest than was accepted for the other overheads.

III. The Double Deduction Issue

■ The Government also contends that both taxes and interest were allowed as deductions in computing plaintiffs' net income which was subject to taxation in the years from 1909 through 1916, pursuant to the Corporation Tax Act of August 5, 1909, 36 Stat. 11, 112; the Income Tax Act of 1913, 38 Stat. 114, 116, and the Revenue Act of 1916, 39 Stat. 756. Counsel for the Government have filed affidavits showing that they have in their temporary custody, tax returns filed by the Southern Railway Company for the years 1909 through 1916 reflecting deductions from gross income claimed by the Southern Railway for interest and domestic taxes paid during the periods covered by the returns. Consequently, the Government says, if the disputed estimates for taxes and interest are accepted, it is entirely possible that the result would be to allow plaintiffs a double deduction which is forbidden by the Internal Revenue Codes of 1939 and 1954.

It is plaintiffs' primary position that the ICC estimates for taxes and interest should be accepted without reduction, the same as the other components of the taxpayers' Federal tax inventory. Alternatively in their brief and during oral argument counsel for the plaintiffs stated if the court disagrees with the plaintiffs about the deductions taken in the years prior to 1918, it would be appropriate to determine the amount of plaintiffs' recovery to reduce plaintiffs' tax bases by that portion of interest and taxes deducted in their Federal tax returns for the years 1909–18 that is fairly attributable to interest and taxes during construction of Federal Inventory Property, constructed during those years and retired during the years in suit.

We agree with the Government's contention. The circumstances with respect to the prior deductions for taxes and interest are distinguishable from the situation which the court faced in *Boston & Maine, supra,* where the court concluded that there was no factual basis for the Commissioner's estimate of deductions for depreciation taken prior to 1913. Here, it appears from the Government's brief and affidavits that the tax returns showing the deductions taken are available.

The excise tax promulgated in the Corporation Tax Act of 1909 was a tax levied on the income of a corporation for the privilege of doing business. Congress enacted this tax on income in the form of an excise tax so that it would pass constitutional muster in the period prior to the enactment of the Sixteenth Amendment. *See Flint v. Stone Tracy Co.,* 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389 (1911), which upheld the constitutionality of the Corporation Tax Act.

In addition, our examination of the three taxing statutes shows that all three contain practically identical language which permitted corporations to deduct interest and taxes from gross income.

The 1909 Act, at 36 Stat. 113, provides: * * * net income shall be ascertained by deducting from the gross amount of the income of such corporation * * * interest actually paid within the year on its bonded or other indebtedness to an amount of such bonded and other indebtedness not exceeding the paid-up capital stock of such corporation * * *; [and] all sums paid by it within the year for taxes imposed under the authority of the United States or of any State or Territory thereof * * *.

The 1913 Act, at 38 Stat. 172–73, provides:

* * * net income shall be ascertained by deducting from the gross amount of the income of such corporation * * * the amount of interest accrued and paid within the year on its indebtedness to an amount of such indebtedness not exceeding one-half of the sum of its interest bearing indebtedness and its paid-up capital stock outstanding at the close of the year * * *; [and] all sums paid by it within the year for taxes imposed under the authority of the United States or of any State or Territory thereof * * *.

The 1916 Act, at 39 Stat. 767–69, provides:

In the case of a corporation, * * * net income shall be ascertained by deducting from the gross amount of its income received within the year from all sources * * * [t]he amount of interest paid within the year on its indebtedness to an amount of such indebtedness not in excess of the sum of (a) the entire amount of the paid-up capital stock outstanding at the close of the year, or, if no capital stock, the entire amount of capital employed in the business at the close of the year, and (b) one-half of its interest bearing indebtedness then outstanding * * *; [and] [t]axes paid within the year imposed by the authority of the United States, or its Territories, or possessions, or any foreign country, or under the authority of any State, county, school district, or municipality, or other taxing subdivision of any State, not including those assessed against local benefits.

Both the 1939 and the 1954 Internal Revenue Codes expressly provide that second deductions are not permitted for taxes and interest—

* * * for which deductions have been taken by the taxpayer in *determining net income* for the taxable year or prior taxable years * * *. [IRC of 1939 § 113(b)(1)(A), emphasis added].

* * * for which deductions have been taken by the taxpayer in *determining taxable income* for the taxable year or prior taxable years * * *. [IRC of 1954 § 1016(a)(1), emphasis added].

We hold, therefore, that on the remand of this case for the determination of the amounts plaintiffs are entitled to recover, their tax bases shall be reduced by that portion of the interest and taxes deducted in their Federal tax returns for the years 1909–18 that is fairly attributable to the interest and taxes during construction of the Federal Inventory Property, which was constructed during those years and retired during the years in suit. The burden of proof shall be upon plaintiffs to establish the amount of such interest and tax deductions in the light of the available records.

IV. Conclusion

For the reasons stated above, plaintiffs' motions for partial summary judgment are granted to the extent stated. The cases are remanded to the trial division for further proceedings, including a determination of the amount plaintiffs are entitled to recover, in accordance with this opinion.